UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:20-CR-0567-B |
| | § | |
| ANDREW CHARLES BEARD, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Andrew Charles Beard ("Beard")'s Motion to Suppress

Evidence (Doc. 37) and Motion to Suppress Evidence and For a Hearing Under *Franks v. Delaware*

(Doc. 39). For the reasons that follow, the Court **DENIES** the Motions.

## I.

## BACKGROUND

A.    *Factual Background*[1]

1.    The Attack on Burkett and Resulting Investigation

On the morning of October 2, 2020, Alyssa Burkett ("Burkett") drove to her job at the

leasing office of the Greentree Apartments in Carrollton, Texas. After arriving at work and while still

in the parking lot, Burkett was attacked by an unidentified individual. Burkett's attacker shot her

in the head with a shotgun while she sat in her car. Realizing that Burkett had miraculously survived

the shooting and was attempting to escape, Burkett's attacker stabbed her several times with an

---

[1] This recitation of the facts is drawn from the parties' briefing, relevant affidavits of law enforcement officials, and testimony provided at the motion hearing. *See* Doc. 37, Def.'s Mot. Suppress; Doc. 37-1, Def.'s App'x, 4–6; Doc. 47, Gov't's Resp. A certified transcript of the hearing has not yet been filed in this case, but the Court has reviewed the rough transcripts in considering this motion.

unidentified sharp object.[2] Witnesses immediately called 911, attempted to administer aid to Burkett, and some saw Burkett's attacker fleeing the scene. Burkett died within minutes of the attack.

Among the police officers to respond to the crime scene were Carrollton Police Officers Losack, Harding, Bonner, and Burnham. After they arrived, they and other officers immediately began speaking with witnesses, some of whom worked with Burkett at the apartment complex. In statements to police, eyewitnesses described Burkett's attacker as a male dressed in all black, wearing a black covering over his face and head, approximately 6'0"–6'2", of skinny-to-medium or medium-build, and driving a black SUV or truck. Some witnesses stated that they believed Burkett's attacker was black, while others said that they could not discern a race due to the attacker's facial covering. One of Burkett's coworkers ("M.J.") mentioned to police that Burkett regularly talked about problems that she was having with Defendant Beard, who is the father of Burkett's child and with whom Burkett had been engaged in a tumultuous child custody battle. M.J. also told police that Burkett was afraid of Beard and was worried that he might kill her, and that she had advised Burkett to purchase a gun.

Sometime later, Burkett's mother ("T.C.") arrived at the scene and spoke with police. T.C. immediately expressed her belief that Beard was responsible for the attack based on the ongoing custody dispute, at one point mentioning that the judge presiding over the dispute had very recently made a ruling in Burkett's favor.[3] Like M.J., T.C. mentioned that Burkett had told her "that she felt

---

[2] Police later found a knife sheath at the scene that they believe housed the object used to stab Burkett.

[3] The probable-cause affidavit that Beard uses to challenge various search warrants, *see infra* note 6, states that police learned that Beard and Burkett "had a court hearing two days [before the attack] . . . where the judge ordered [Burkett] to have custody of their child." Doc. 37-1, Def.'s App'x, 4. As explained *infra* Section II(B)(1), the parties agree that this misrepresented the true status of the family court proceedings but disagree regarding the effect of that misrepresentation.

[Beard] was the type of guy that was going to kill her." T.C. also added that Beard had on at least one occasion stated that he would "do anything to get custody of [the child] and there was nothing she could do to stop him."

Police also spoke with Burkett's boyfriend ("B.E.") who described Beard as "overly obsessive." Like M.J. and T.C., B.E. told police that Burkett was worried that Beard would kill her. B.E. also stated that he and Burkett believed that Beard had been following them because Beard had recited their full home addresses in court even though this information was never provided to Beard.

In addition to conducting witness interviews, police inspected Burkett's vehicle and discovered that a small, black, battery-powered tracking device had been attached to the undercarriage of her car. After finding the device, police informed B.E., who discovered that a similar tracking device had been placed under his truck.

    2.    <u>The Traffic Stop</u>

Once Beard was identified as a suspect in Burkett's murder, police immediately began surveilling his home in Rowlett, Texas. Roughly three hours after Burkett was attacked, Rowlett police officers surveilling Beard's home observed Beard and a woman (Beard's girlfriend) load bags and Burkett/Beard's child into Beard's white Ford F-150 truck. As Beard departed, the Rowlett officers surveilling the house noticed that the truck did not have a front license plate and notified Carrollton police so a traffic stop could be initiated. At this point, no warrant had been issued for Beard's arrest or to search or seize his property.

Officers Burnham and Meyer were the ones who stopped the vehicle. Officer Burnham testified that he had been involved in "roundtable" conversations with other officers earlier that day at the crime scene. He also testified that before and during the traffic stop, he and Meyer were in

constant communication with Officer Losack, who was their supervisor and who was running the investigation from the crime scene. After Burnham and Meyer stopped the vehicle and positively identified Beard, they asked him to exit the vehicle, placed him in handcuffs, and sat him on the side of the road. Burnham and Meyer then removed Beard's girlfriend and the child from the truck and asked Beard for consent to search the truck, which he denied. After a one-hour and fourteen-minute stop, Losack ordered Burnham and Meyer to secure the evidence; they seized Beard's truck and all its contents, including two cell phones belonging to Beard. Burnham and Meyer did not search the truck or the phones at this time, instead impounding the vehicle pending a warrant. Notwithstanding this action, Beard was not formally arrested. Instead, Burnham and Meyer insisted that Beard was *not* under arrest and that he was free to leave. Ultimately, Beard was permitted to order a ride for himself, his girlfriend, and his child to the Carrollton Police Department.

       3.       Execution of Search Warrants and Beard's Arrest

Later that day, Officer Bonner applied for a search warrant for Beard's home. *See* Doc. 37-1, Def.'s App'x, 3–6. In supported of his application, Bonner created a probable-cause affidavit (the "Bonner Affidavit") based upon his own interactions with witnesses at the crime scene as well as those of other responding officers, particularly Officer Harding. *See id.* In the affidavit, Bonner largely outlines the information described *supra* Section I(A)(1). *See id.* In addition, Bonner's affidavit describes an interaction police had with Burkett one month before she was attacked:

> It was . . . learned that [Burkett] was recently involved in a report with Carrollton Police possibly involving [Beard]. The most recent call was on September 2, 2020 at the Greentree apartments. An anonymous tip came into dispatch reporting that [Burkett] was making hand to hand drug transactions out of the truck of her vehicle at the apartments. Officers arrived on the scene and spoke with [Burkett]. [Burkett] denied any wrongdoing and informed the officers of the custody battle with [Beard]. She provided consent for them to search her vehicle. While searching the trunk, they found five baggies of marijuana, a Taurus pistol with the serial number removed, a

plastic baggie of cocaine, and $29 in cash. [Burkett] provided an affidavit for the officers and she was not arrested.

*Id.* at 5. Officer Losack, who testified to his knowledge of Burkett's earlier interaction with police, testified that police did not arrest Burkett at that time because they suspected that Beard was responsible for planting the contraband to frame Burkett and weaken her legal position in their custody battle. Losack also testified that, despite their belief that Beard was responsible for the tip, police did not think they had sufficient evidence of Beard's involvement to pursue charges at that time.

The reviewing magistrate granted the search warrant and police recovered significant amounts of evidence from Beard's home. Over the next few days, law enforcement sought, obtained, and executed several other search warrants, including warrants authorizing the search of Beard's truck and cell phones recovered from the traffic stop. State and federal warrants were issued for Beard's arrest, and Beard was arrested on October 5, 2022.

B.    *Procedural History*

In the Superseding Indictment, Beard is charged with the following counts: (1) Possession of an Unregistered Firearm Silencer[4]; (2) Cyberstalking Using a Dangerous Weapon and Resulting in Death; and (3) Using, Carrying, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence. *See* Doc. 29, Superseding Indictment, 1, 4, 5. On March 24, 2022, Beard filed a Motion to Suppress Evidence (Doc. 37) and a Motion to Suppress Evidence and for a Hearing

---

[4] During the search of Beard's home, officers recovered a handgun with a threaded barrel and what the Government believes is a homemade, unregistered firearm silencer. The Government does not allege that it was used in or otherwise connected to Burkett's murder. *See* Doc. 1, Compl.; Doc. 29, Superseding Indictment; Doc. 47, Gov't's Resp.

Under *Franks v. Delaware* (Doc. 39)[5] contending that the evidence against him was obtained in violation of his Fourth Amendment rights and should be suppressed. *See* Doc. 37, Def.'s Mot. Suppress; Doc. 39, Def.'s *Franks* Mot. Specifically, Beard challenges the evidence obtained from: (1) certain designated search warrants and the arrest warrants; (2) the warrantless seizure of himself, his truck, and his cell phones at his traffic stop; and (3) the warrantless search of his home, to the extent that officers entered his home or its curtilage before obtaining a search warrant. *See* Doc. 37, Def.'s Mot. Suppress., ¶ 157. The Government responded to the motions and the Court heard oral argument on them on April 25, 2022. *See* Doc. 47, Gov't's Resp. The Court considers the motions below.

## II.

## LEGAL STANDARDS

A.    *The Fourth Amendment and the Exclusionary Rule*

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and further provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "To supplement the bare text, [the Supreme Court] created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011). The focus of the rule is "not on restoring the victim to his rightful position but on deterring police officers from knowingly violating the Constitution." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting

---

[5] The arguments set forth in Beard's Motion to Suppress Evidence and For a Hearing Under *Franks v. Delaware* (Doc. 39) mirror those made in the *Franks* section of his Motion to Suppress (Doc. 37). *Compare* Doc. 37, Def.'s Mot. Suppress, ¶¶ 72–106, *with* Doc. 39, Def.'s *Franks* Mot.

*United States v. Allen*, 625 F.3d at 830, 836 (5th Cir. 2010)). "Thus, application of the rule is 'not a personal constitutional right.' Nor is it automatic in the face of a Fourth Amendment violation." *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir. 2019) (first quoting *Davis*, 564 U.S. at 236; and then citing *Herring v. United States*, 555 U.S. 135, 140 (2009)).

The Supreme Court has recognized a "good faith" exception to the exclusionary rule that immunizes "police conduct 'pursued in complete good faith' because the rule's 'deterrence rationale loses much of its force' in such circumstances." *Wallace*, 885 F.3d at 810 (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). In particular, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring*, 555 U.S. at 142 (quoting *Leon*, 468 U.S. at 922).

B.      *Motions to Suppress*

To suppress evidence on Fourth Amendment grounds, "[t]he party seeking suppression 'has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'" *Wallace*, 885 F.3d at 809 (quoting *United States v. Smith*, 978 F.2d 171, 978 F.2d 171, 176 (5th Cir. 1992)). But this burden may shift if the challenged police action occurred without a warrant, because "warrantless searches and seizures are *per se* unreasonable unless one of the recognized exceptions applies." *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021). Thus, if the movant makes a preliminary showing that a search or seizure occurred without a warrant, the burden shifts to the prosecution to show "that [the] warrantless search or seizure fits within one of the [recognized] exceptions" to the warrant requirement. *Id.*; *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

## III.

## ANALYSIS

*A.*     *Fourth Amendment Standing*

As a preliminary matter, the Court finds that Beard has standing to challenge the evidence at issue. "[A] defendant seeking to suppress evidence must show not only that the police committed an unreasonable search or seizure, but also that the search or seizure 'infringed [a Fourth Amendment] interest of the defendant' himself." *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (second alteration in original) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). A defendant can establish Fourth Amendment standing in one of two ways: "[f]irst, [the defendant] may object to the 'physical intrusion of a constitutionally protected area' in which he has a property interest. And second, he may object to government action that violates a 'reasonable expectation of privacy . . . in the place searched.'" *Id.* (third alteration in original) (first quoting *United States v. Jones*, 565 U.S. 400, 407 (2012); and then quoting *Byrd v. United States*, 138 S. Ct. 1518, 1528 (2018)).

Beard claims that he has standing to challenge the evidence at issue because it was obtained by searches and seizures from constitutionally protected areas or areas where he has a property interest and a reasonable expectation of privacy. Doc. 37, Def.'s Mot. Suppress, ¶ 70. The Government concedes that Beard has standing to challenge the search warrant on his home but claims that Beard has failed to establish a legitimate privacy expectation in the places and items seized and searched pursuant to the remaining warrants. *See* Doc. 47, Gov't's Resp., 11.

In reviewing the briefing, Beard appears to challenge mostly evidence obtained from his person, his home, or from his truck (which he was driving at the time of the traffic stop). *See* Doc. 37,

Def.'s Mot. Suppress, ¶¶ 50, 157. Each of these is either a constitutionally protected area or a place in which he has a property interest and a reasonable expectation of privacy. *See, e.g.*, *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992) (noting that a driver has standing to object to a vehicular search and that the owner of a home has standing to object to search of the home); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (noting that an individual has standing to contest the seizure of his person). The remaining evidence, which is largely digital information obtained from third parties, Beard challenges as fruit of the poisonous tree—which does not typically require a separate showing of standing. *See* Doc. 37, Def.'s Mot. Suppress, ¶¶ 50, 153–155; *see United States v. Fields*, 2021 WL 3215089, at *7 n.60 (M.D. La. July 29, 2021) ("[I]t is not the case that 'the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the violation which constitutes the poisonous tree and separate standing regarding the evidence which constitutes the fruit of that poisonous tree.'" (quoting *United States v. Olivares-Rangel*, 458 F.3d 1104, 1118 (10th Cir. 2006)). Accordingly, the Court will consider the substance of Beard's arguments as to all the evidence challenged.

B.    *Evidence Obtained Through Warrants*

    The Court first turns to Beard's suppression arguments regarding evidence obtained pursuant to warrants. Beard argues that the Court should suppress all evidence deriving from: (1) the warrant authorizing the search of his home; (2) the warrant authorizing the search of his truck (that at this point, had already been seized by police); (3) thirty-four warrants authorizing searches and seizures of physical items found in Beard's home, truck, or on his person, and digital accounts and information belonging to Beard; and (4) the state and federal warrants for his arrest.[6] *See id.* ¶¶ 50,

---

[6] Beard's argument focuses exclusively on the first warrant authorizing the search of his home and the alleged deficiencies in the supporting Bonner Affidavit. *See id.* ¶¶ 50, 101–07, 119, 151–55. Though he

157–58. For this challenge, Beard bears the traditional burden of showing that the "evidence . . . was obtained in violation of his Fourth Amendment rights." *Wallace*, 885 F.3d at 809.

When a motion to suppress challenges the admissibility of evidence obtained pursuant to a warrant, courts in the Fifth Circuit conduct a two-step inquiry. *Allen*, 625 F.3d at 835. "First, the court determines 'whether the good-faith exception to the exclusionary rule . . . applies. If it does, [the court] need not reach the question of probable cause for the warrant unless it presents a novel question of law, resolution of which is necessary to guide future action by law enforcement officers and magistrates." *United States v. Gentry*, 941 F.3d 767, 779 (5th Cir. 2019) (alterations in original). Second, if the good-faith exception is inapplicable, the court "determines whether the magistrate issuing the warrant had a 'substantial basis for believing there was probable cause for the search.'" *Allen*, 625 F.3d at 835 (quoting *Davis*, 226 F.3d at 351).

There are four situations where the good-faith exception to the exclusionary rule does not apply:

> (1) When the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) When the issuing magistrate wholly abandoned [their] judicial role; (3) When the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) When the warrant is so facially deficient in failing to particularize the place to be searched or things to be seized that executing officers cannot reasonably presume it to be valid.

---

does not make particularized arguments as to the remaining warrants, he claims that they are similarly invalid because they were (1) supported by probable cause affidavits containing the same or similar false or inadequate information as the Bonner Affidavit, and were thus defective for the same reason; or (2) supported by additional information that was obtained from the illegal search of his home, and are therefore the fruit of the poisonous tree. *See id.* Thus, effectively, Beard attempts to use the Bonner Affidavit as a proxy to challenge the remaining search warrants. *See id.* ¶¶ 50, 101–07, 119. Because Beard has failed to show evidence obtained from the search of his home should be suppressed under the exclusionary rule, the Court assumes without deciding that the form of Beard's challenge by proxy is appropriate, and finds his arguments about the other warrants similarly lacking.

*United States v. Beverly*, 943 F.3d 225, 232–33 (5th Cir. 2019) (citation omitted); *see, e.g.*, *Leon*, 468 U.S. at 923.

Beard argues that the first and third situation apply. Doc. 37, Def.'s Mot. Suppress, ¶ 2. For the reasons detailed below, the Court disagrees.

1.    The Probable Cause Affidavits Did Not Deliberately or Recklessly Mislead the Magistrates

Beard contends the good-faith exception cannot apply because the magistrates issuing the search warrants were "misled by information in the probable cause affidavits that the affiants knew were false or would have known were false except for [their] reckless disregard of the truth." Doc. 37, Def.'s Mot. Suppress, ¶¶ 72–106. He also requests an evidentiary hearing to further establish this argument. *See* Doc. 39, Def.'s *Franks* Mot.

To evaluate whether purported falsehoods in a probable cause affidavit warrant suppression, courts "apply the standard from *Franks v. Delaware*, 438 U.S. 154 (1978), which requires a defendant to show that '(1) allegations in a supporting affidavit were deliberate falsehoods or made with reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause.'" *Mays*, 466 F.3d at 343. To be entitled to an evidentiary hearing under *Franks*, a defendant must "make a sufficient preliminary showing" as to the first prong. *See United States v. Kendrick*, 980 F.3d 432, 439–40 (5th Cir. 2020) (quoting *Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017)). If he does, then the defendant must establish by a preponderance of the evidence at the resulting hearing "that the affiant[s'] misrepresentations were made intentionally or

with reckless disregard for the truth." *United States v. Martinez*, 25 F.4th 303, 308 (5th Cir. 2022). But here, Beard has failed to make a preliminary showing as to the first prong.[7]

Beard identifies a single falsehood[8] in the Bonner Affidavit, namely, that Officer Bonner wrote that "[i]t was learned that [Beard and Burkett] had a court hearing two days [before the attack] where the judge ordered [Burkett] to have custody of their child." Doc. 37-1, Def.'s App'x, 4; *see* Doc. 37, Def.'s Mot. Suppress, ¶ 77. Beard states that, in reality, he and Burkett had "agreed to the conservatorship of [their child] and [a] visitation schedule," though they disputed who should be the conservator. Doc. 37, Def.'s Mot. Suppress, ¶ 78. Beard further explains that the "hearing" referred to in the Bonner Affidavit was not a "custody hearing," but simply a "telephone conference between the judge and the attorneys" regarding whether Burkett's mother, T.C., could act a caregiver to the child. *Id.* ¶¶ 56, 78–82. This fictitious "loss of custody," Beard argues, was the catalyst for the police's theory of the case, i.e., that Beard was triggered to attack Burkett after he lost custody of his child. *See id.* ¶ 80.

---

[7] At the motion hearing, the Court permitted Beard to call witnesses and introduce evidence to support his *Franks* argument. As such, the Court finds that Beard has been provided a *Franks* hearing. *See United States v. Ortega*, 854 F.3d 818, 825 n.8 (5th Cir. 2017) (finding that a lower court's evidentiary hearing was a *Franks* hearing even though not labeled as such because each party presented witnesses about the *Franks* issue). Nonetheless, to the extent that Beard seeks another hearing, the Court emphasizes that—even considering the evidence and testimony introduced at the motion hearing—Beard has failed to make a preliminary showing entitling him to a separate *Franks* hearing. *See United States v. Pickens*, 2013 WL 1155414, at *5 (N.D. Tex. Mar. 21, 2013).

[8] Beard's motion also states that Bonner misrepresented that M.J., who was at the scene the morning of Burkett's attack, "saw a male suspect exit the truck and shoot towards Burkett" even though M.J. told police that she "'heard only' and did not see the shooting, but only the suspect turning.'" Doc. 37, Def.'s Mot. Suppress, ¶ 74. However, Beard did not allege, in his briefing or during oral argument, that this mischaracterization was made deliberately or recklessly, or that it was material to the magistrate's finding of probable cause. *See id.* ¶¶ 74–100. As such, the Court finds this mischaracterization does not defeat the good-faith exception to the exclusionary rule or entitle Beard to a separate *Franks* hearing. *See Pickens*, 2013 WL 115414, at *6.

The Government concedes that the Bonner Affidavit misrepresented the posture of Beard and Burkett's family court proceedings. *See* Doc. 47, Gov't's Resp., 16. However, the Government argues that Officer Bonner's misrepresentation was the product of a misunderstanding about what was meant by T.C. when she told police that "[Beard and Burkett] had a court date and [the court] ruled in [Burkett's] favor and now this happened today." *Id.* According to the Government, Officer Bonner maintained an innocent mistaken belief that T.C. had been referring to a custody hearing, and therefore did not have the requisite intent to satisfy *Franks*'s first prong. *Id.*

Despite the Government's concession that the Bonner Affidavit misrepresented the status of the family court proceedings, the Court finds that Beard has not made a sufficient showing that the falsehood was deliberately or recklessly included in the affidavit as necessary to carry his burden under *Franks. See Phillips*, 875 F.3d at 262. "In determining whether an affiant acted intentionally or with reckless disregard, 'a court considers the materiality of the misrepresentation, whether exigency or haste preceded the affidavit, the officer's level of training and experience, whether the officer consulted with an attorney, and whether the officer disclosed the fact[s] underlying any conclusory statements in the affidavit.'" *United States v. Pickens*, 2013 WL 1155414, at *5 (N.D. Tex. Mar. 21, 2013) (alteration in original) (citation omitted); *see also United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982) (noting that the materiality of a falsehood to a finding of probable cause may, in some circumstances, create an inference that the falsehood was made recklessly).

Beard claims that "the true and correct facts of the status of the conservatorship proceedings could have easily been obtained by [Officer] Bonner or another officer since all the relevant documents . . . are public records," and that police also could've discovered the true status of the proceedings by contacting Beard's attorney or the court-appointed parent facilitator. Doc. 37, Def.'s

Mot. Suppress, ¶¶ 81–88. But while officers could have further investigated the status of the family court proceedings, Beard has not suggested that (1) officers were told the true status of the proceedings, or (2) Officer Bonner had any other reason to doubt the truth of his affidavit. *See id.*; *cf. United States v. Newton*, 463 F. App'x 462, 465 (5th Cir. 2012) (finding a misrepresentation in an affidavit was "negligent at most" when the allegation appeared to be the product of a misunderstanding and there was "nothing obvious under the circumstances that would have caused [the affiant] to doubt the truth of the affidavit"). Indeed, body camera footage of officers' conversation with T.C. at the scene shows that T.C. told officers, "yesterday, [Beard and Burkett] had a court date and it ruled in her favor and now this happened today." *See* Gov't's Hr'g Ex. 3, at 9:20–9:35. Given that several witnesses had told police about Beard and Burkett's "custody dispute," it was not unreasonable for Bonner to assume that T.C.'s statement was referring to a custody hearing. *See id.*

The circumstances under which the affidavit was created also weigh strongly against finding that the misrepresentation about the hearing was made with reckless disregard for the truth. Officer Bonner is not an attorney, and his affidavit was written in the aftermath of a violent, public murder, necessitating a quick response. *Cf. Pickens*, 2013 WL 1155414, at *6. Indeed, in dash cam videos from the crime scene, officers can be heard expressing serious concerns regarding the well-being of Burkett and Beard's child, who they knew to be in Beard's possession at the time. *See* Def.'s Hr'g Ex. 90. Officer Losack directly testified to these concerns at the hearing. Given the above context, the Court finds that Beard has at best alleged that the misrepresentation about the hearing was negligently included in the Bonner Affidavit—which is insufficient to defeat the good-faith exception to the exclusionary rule and insufficient to show entitlement to a full *Franks* hearing.

2.    The Probable Cause Affidavits Were Not Bare Bones

Next, Beard argues that the affidavits supporting the warrants at issue are "bare bones." Doc. 37, Def.'s Mot. Suppress, ¶¶ 107–19. "A 'bare bones' affidavit [is one that] contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014) (citation omitted). "Generally, examples of 'bare bones' affidavits include those that merely state that the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe' that" a crime has been committed. *See United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) (alterations in original). "Whether an affidavit is . . . bare bones . . . is determined by a totality of the circumstances." *Robinson*, 741 F.3d at 597.

Here, the Court finds that the Bonner Affidavit contains sufficient factual information to support a finding of probable cause. Beard makes several arguments in his motion that the affidavits are bare bones, but each is effectively a challenge as to the weight the magistrate may have given to specific facts. *See* Doc. 37, Def.'s Mot. Suppress, ¶¶ 108–15, 119 ("[O]nce this Court excises the parts of the affidavits that do not support probable cause, all that is left are bare-bones affidavits that do not support probable cause for the warrants."). But the purpose of the bare-bones inquiry is not to second guess how the magistrate weighed specific facts in finding probable cause, it is to determine whether the affidavit is "so deficient in demonstrating probable cause that it renders an officer's belief in its existence completely unreasonable." *United States v. Huerra*, 884 F.3d 511, 515 (5th Cir. 2018) (citation omitted); *see Robinson*, 741 F.3d at 597. And here, the Bonner Affidavit contains three single-spaced pages of facts containing reasonable indicia of probable cause. *See* Doc. 37-1, Def.'s App'x, 3–6. It includes the following: eye witnesses identified Burkett's attacker as a male roughly

the height and size of Beard; M.J., T.C., and B.E. were each aware of Burkett's contentious child custody proceedings with Beard, and each stated that Burkett had told them she feared that Beard would kill her; T.C. stated that Beard had told Burkett that he would do anything to get custody of their child; Burkett and B.E. feared that Beard had been following them based on statements Beard made in court; and tracking devices were found on both Burkett's and B.E.'s vehicles.[9] *See id.* Put simply, the affidavit contained "much more than 'wholly conclusory statements' that 'lack the facts and circumstances from which a magistrate can independently determine probable cause,' . . . and a reasonable officer could have relied on this warrant in good faith." *See Huerra*, 884 F.3d at 516.

Accordingly, the Court finds that the good-faith exception to the exclusionary rule applies, and Beard's motion to suppress evidence obtained through the designated warrants necessarily fails.

C.     *Evidence Obtained at Beard's Traffic Stop*

The Court next considers Beard's arguments that the seizure of himself, his truck, and his cell phones at his traffic stop violated his Fourth Amendment rights. Doc. 37, Def.'s Mot. Suppress, ¶¶ 120–39. Because the Government concedes that these seizures were made without a warrant, *see* Doc. 47, Gov't's Resp., 25, it bears the burden of showing that the warrantless seizures fall under an exception to the Fourth Amendment's warrant requirement. *See Thomas*, 997 F.3d at 609. As explained below, the Court finds that the Government has met this burden.

---

[9] The Court does not consider the portion of the Bonner Affidavit describing Burkett's September 2, 2020, interaction with police relevant to determining the validity of the resulting search warrant. The affidavit does not describe why officers believed that the anonymous drug tip was connected to Beard, nor is their reasoning immediately apparent from the text of the affidavit. *See* Doc. 37-1, Def.'s App'x, 5. Although Officer Losak provided this context at the motion hearing, its absence from the Bonner Affidavit precludes the Court from considering it in determining the validity of the resulting search warrant. *See United States v. Brown*, 567 F. App'x 272, 283 (5th Cir. 2014) ("Probable cause must be established in the affidavit and evidence presented to the magistrate; an 'otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." (quoting *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971)).

1.     The Seizure of Beard was Lawful

First, the seizure of Beard himself was lawful. "[A] traffic stop is a 'seizure' for Fourth Amendment purposes. To justify that seizure, the Government bears the burden of showing (1) the stop was lawful in the first instance and (2) the officer's actions after detention were 'reasonably related in scope' to the circumstances giving rise to the stop." *United States v. Mack*, 857 F. App'x 798, 801 (5th Cir. 2021) (first citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); and then citing *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013)).

Beard concedes that he was properly stopped for a traffic violation but argues that his prolonged stop and the seizure of his property was unlawful. Doc. 37, Def.'s Mot. Suppress, ¶¶ 124–39. As evidence of officers' lack of probable cause to conduct what he asserts was a de facto arrest, Beard points to police dash cam footage from the crime scene in which he asserts Officer Losack can be heard stating that he did not believe they had enough evidence to arrest Beard.[10] The Government responds that, even if Beard's traffic stop was excessively long so as to constitute a de facto arrest, his seizure was lawful because officers had probable cause to arrest him. Doc. 47, Gov't's Resp., 31.

The Court agrees with the Government and therefore declines to opine on whether Beard's traffic stop morphed into a de facto arrest. If probable cause for an arrest exists, then a de facto arrest is justified. *See United States v. Massi*, 761 F.3d 512, 524 (5th Cir. 2014) (explaining that when a *Terry* detention morphs into a de facto arrest, probable cause is required); *United States v. Pompa*, 434

---

[10] In the video, Losack can be heard stating, "he's a suspect in this but we don't have enough evidence to [unintelligible]." *See* Def.'s Hr'g Ex. 90. Beard contends this statement was about whether officers had probable cause to arrest Beard, Doc. 37, Def.'s Mot. Suppress, ¶ 127, but the context of the conversation strongly suggests that Losack was discussing whether police had enough evidence to justify seizing the child from Beard. *See* Def.'s Hr'g Ex. 90.

F.3d 800, 805 n.3 (5th Cir. 2005). Probable cause for an arrest exists "when an officer is aware of 'reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe' that a crime has been or will be committed." *Voss v. Goode*, 954 F.3d 234, 238–39 (5th Cir. 2020) (quoting *Kohler v. Englade*, 470 F.3d 1104, 1105 (5th Cir. 2006)). Critically, this is an *objective* inquiry, meaning officers' subjective beliefs regarding the existence of probable cause are irrelevant so long probable cause objectively exists.[11] *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear than an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *see also Voss*, 954 F.3d at 238 (noting that an arrest can be justified "by showing probable cause for any crime," not just the crime that officers believed or stated justified the arrest). All that matters is what *facts* were known to officers at the time of arrest. *See id.*

In determining what facts were known at the time of arrest, courts may apply the collective knowledge doctrine, under which "it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citing *United States v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir. 1992)).

In the present case, the Government has shown that the officers at the traffic stop had probable cause to arrest Beard. At the motion hearing, Officer Burnham testified that, before conducting Beard's traffic stop, he had been involved in "round table" conversations with other officers earlier that day at the crime scene wherein they exchanged information learned from

---

[11] As such, even if Losack did subjectively believe that police lacked probable cause to arrest Beard, this would not affect the legality of Beard's seizure. *See Devenpeck*, 543 U.S. at 153.

witnesses, discussed the investigation, and received assignments from Officer Losack. Further, Burnham testified that he and Officer Meyer were in constant communication with Officer Losack, who was familiar with the investigation and who was the one who ordered the seizure of Beard's property. The Court finds this unrebutted testimony satisfactory to establish that the collective knowledge doctrine applies such that the Court may impute the knowledge of Losack and other officers at the crime scene to Burnham and Meyer. *See Ibarra*, 493 F.3d at 530. And through this collective knowledge, Burnham and Meyer were aware that: Beard and Burkett were involved in a contentious custody dispute; Burkett told several individuals that she was afraid of Beard; Burkett and B.E. suspected that Beard had been following them; tracking devices were found attached to Burkett and B.E.'s vehicles; and Burkett and police both suspected that Beard had attempted to frame Burkett for crimes she did not commit just one month before the attack.[12] Given these facts, Burnham and Meyer could reasonably conclude, in light of the facts and circumstances within their personal and collective knowledge at the time when Beard's traffic stop would have become a de facto arrest, that Beard was responsible for Burkett's attack. *See Voss*, 954 F.3d at 238. Accordingly, because officers had probable cause for his arrest, the seizure of Beard's person was lawful.

2.      The Seizure of Beard's Property was Lawful

Next, the Court finds that the seizure of Beard's property at the traffic stop was lawful. The Court first addresses the seizure of Beard's truck and then discusses the seizure of Beard's cell phones.

---

[12] Unlike the Court's inquiry into the sufficiency of the Bonner Affidavit and the resulting search warrant, the Court considers Burkett's September 2, 2020, interaction with police relevant to determining whether there was probable cause for Beard's arrest. *Contra supra* note 9. This is because, unlike its inquiry into the sufficiency of a search warrant, the Court's determination of probable cause for Beard's arrest (and the seizure of his property) involves considering the totality of the circumstances known to the officers—not just the circumstances described in an affidavit. *Compare Brown*, 567 F. App'x at 283 (describing the search warrant analysis), *with Massi*, 761 F.3d at 524 (describing the de facto arrest analysis).

   i.   *Beard's Truck*

The Government argues that the warrantless seizure of Beard's truck was lawful under the automobile exception because the officers that stopped Beard had probable cause to seize the truck by way of their collective knowledge.[13] Doc. 47, Gov't Resp., 26–28. The automobile exception allows "police [to] stop and search a vehicle without obtaining a warrant if they have probable cause to believe it contains contraband."[14] *United States v. Beene*, 818 F.3d 157, 164 (5th Cir. 2016) (citing *United States v. Ross*, 456 U.S. 798, 807–09 (1982))). "The exception is justified by the mobility of vehicles and occupants' reduced expectations of privacy while traveling on public roads." *Id.* Importantly, no separate exigency is required for the automobile exception to apply. *See United States v. Deleon*, 689 F. App'x 278, 279 (5th Cir. 2017); *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam).

Here, in addition to the facts giving rise to probable cause for Beard's arrest, Officers Burnham and Meyer were aware that the officers surveilling Beard's home had seen Beard loading bags into the truck before departing. Under the totality of the circumstances, these facts are sufficient to establish that police had probable cause to believe that Beard's truck contained evidence of Burkett's murder. Thus, the automobile exception applies, and the warrantless seizure of Beard's truck was lawful. *See Beene*, 818 F.3d at 164.

---

[13] The collective knowledge doctrine applies to probable cause for searches as well as arrests. *See Ibarra*, 493 F.3d at 531 (applying the collective knowledge doctrine to find probable cause for a search); *United States v. Hooker*, 416 F. App'x 467, 471 n.2 (5th Cir. 2011).

[14] "There is no constitutional difference between 'seizing and holding a car before presenting the probable cause issue to the magistrate and . . . carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.'" *United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996) (quoting *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)).

ii.    *Beard's Cell Phones*

The Government argues that the warrantless seizure of Beard's cell phones during his traffic stop was lawful because exigent circumstances justified the seizure. Doc. 47, Gov't's Resp., 31–33.

Under *United States v. Place*, 462 U.S. 696, 701 (1983), police may seize personal property pending a warrant if there is (1) probable cause to believe the property contains evidence of a crime; and (2) exigent circumstances justify the warrantless seizure. *See United States v. Diaz*, 435 F. App'x 329, 332 (5th Cir. 2011). Both prongs are satisfied here.

First, in addition to their knowledge of the facts giving rise to probable cause for Beard's arrest and the seizure of Beard's truck, Officers Burnham, Meyer, and Losack reasonably concluded that Beard's cell phones would contain evidence of Burkett's murder—specifically, location data, call histories, internet searches, etc. *See* Doc. 47, Gov't's Resp., 32. At the hearing, Officer Losak explained that, because of the significant amount of information they contain, cell phones are an especially important piece of evidence in the context of a murder investigation. This is sufficient probable cause to establish the first prong under *Place*. *See* 462 U.S. at 701.

Second, exigent circumstances justified the seizure. Importantly, prevention of "the imminent destruction of evidence" is an exigent circumstance that may warrant seizure of property pending issuance of a warrant. *Kentucky v. King*, 563 U.S. 452, 460 (2011); *see Diaz*, 435 F. App'x at 332. And here, officers had reason to believe that, given "the easily destructible nature of the evidence in which the agents were interested," the evidence "would not have been protected from destruction while a warrant was prepared and obtained." *Diaz*, 435 F. App'x at 332; *see United States v. Harris*, 2016 WL 1441382, at *10 n.6 (E.D. Vir. Apr. 11, 2016) (collecting cases where courts have found exigent circumstances justified seizure of electronic devices to prevent their destruction). Indeed, at

the motion hearing, Officer Losack testified to the ease of destroying or deleting cell phone evidence, and stated that destruction of this evidence could severely hamper an investigation. In particular, Losack testified that he ordered Burnham and Meyer to seize Beard's cell phones at the traffic stop because he feared that Beard would destroy or delete evidence from his phone if they did not secure it pending a search warrant. The Court finds Losack's testimony credible, and therefore concludes that exigent circumstances justified the warrantless seizure of Beard's phones.

D.      *Evidence Obtained from the Allegedly Early Search of Beard's Home*

Finally, the Court addresses Beard's argument that all evidence obtained from the search of his home should be excluded as unlawfully obtained without a warrant. Doc. 37, Def.'s Mot. Suppress, ¶¶ 140–52. As support, Beard avers that "prior to obtaining the warrant to search Beard's home . . . , in one of the police bodycams an officer is heard saying that a room in the house was 'messy,' as though he had been inside the home or its curtilage to peer into a window prior to officers obtaining the search warrant." *Id.* ¶ 147. The Government flatly denies that any officer entered Beard's home or its curtilage without a warrant and argues that "Beard has not identified—nor has the [G]overnment found—any police bodycam footage indicating" the opposite. Doc. 47, Gov't's Resp., 25.

Beard, as the party seeking suppression, has the burden of making an initial showing that a warrantless search actually occurred. *See United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1997) (noting that "*if a defendant produces evidence that he was arrested or subjected to a search without a warrant*, the burden shifts to the government to justify the warrantless search" (emphasis added)); *Roch*, 5 F.3d at 897; *see also United States v. Kasnetz*, 2022 WL 847217, at *2 (N.D. Tex. Mar. 22, 2022) ("Even in situations in which the government may bear the ultimate burden of persuasion, 'the

defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality.'" (quoting *De La Fuente*, 548 F.2d at 534)). But at the motion hearing, Beard did not produce (or even attempt to produce) evidence showing that officers entered his home before obtaining a search warrant. As such, Beard has failed to make a prima facie showing that a warrantless search of his home occurred, and his motion to suppress on that ground must be denied.

## IV.

## CONCLUSION

As explained above, Beard has failed to meet his burden to show that the evidence obtained pursuant to warrants should be suppressed because the good-faith exception to the exclusionary rule applies. Further, the Government has carried its burden to show that the warrantless seizure of Beard, his truck, and his cell phones at his traffic stop were lawful under exceptions to the warrant requirement. And finally, Beard has failed to make a preliminary showing that officers entered his home before the warrant to search it was issued, and thus has failed to show that evidence obtained from his home should be suppressed. For these reasons, the Court **DENIES** Beard's Motion to Suppress (Doc. 37) and his Motion to Suppress and for a Hearing under *Franks v. Delaware* (Doc. 39).

SO ORDERED.

SIGNED: May 3, 2022.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 23 -